UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | : | 19 CR. 225 (RBW) |
| v. | : | |
| AHMED KHIDIR EL KHEBKI | : | |
| Defendant. | : | |

### **DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

### INTRODUCTION

Defendant Ahmed El Khebki is pending sentencing before this Court, having entered a timely guilty plea to Count Nine of the Indictment, which charged him with Conspiracy To Commit Money Laundering, in violation of 18 United States Code Section 1956. The defendant admitted to his participation in a scheme that defrauded money from the Government of Kuwait's Health Ministry in which his co-defendants created and submitted false invoices for medical services that were never provided. The funds were then deposited into what the prosecution refers to as "shell companies" (with names that resembled actual medical care providers), including two business entities created by the defendant.

As explained herein, Mr. El Khebki was not an employee of the Kuwaiti government, did not initiate or implement the scheme to defraud, but rather was made a witting accomplice because of financial necessity. In the Plea Agreement, the parties specifically left unresolved the issue as to the amount of loss attributable to the defendant. Although the Government alleges that the defendant is responsible for the entire amount of the loss, or more than $1.5 million dollars, his actual and foreseeable responsibility is limited to the approximately $450,000.00 deposited into the business accounts he created. Moreover, contrary to the Government's position, the defendant's conduct does not warrant an upward sentencing adjustment for "sophisticated

1

means," since opening bank accounts would not qualify as sophisticated conduct under the guidelines.

As explained herein, given the defendant's age, his very poor health, his limited role in the charged conspiracy and relatively minor financial gain, his lack of criminal history, his strong family support (as evidenced by the letters attached hereto under seal as Exhibit 1), as well as all of the other personal and societal factors set forth in the federal sentencing statute, 18 United States Code Section 3553(a) - **this Court should sentence Mr. El Khebki to a term of imprisonment of no more than one year and one day.** Such a sentence is also necessary to avoid unwarranted sentencing disparity because, among other reasons, the case against two alleged members of the conspiracy were outright dismissed, one defendant was acquitted at trial and this Court sentenced co-conspirator Huwida Fadl to one year and one day of incarceration, despite her relatively larger role in the conspiracy than Mr. El Khebki.

In the final analysis, the sentence requested in this case would satisfy the paramount consideration that the sentence imposed be "sufficient, but no greater than necessary" to punish. Kimbrough v. United States, 552 U.S. 85, 101 (2007).

## FACTUAL BACKGROUND

*The Conspiracy And Its Members*

The Government of Kuwait has a national policy of paying for the medical treatment of its citizens in the United States. This amounts to millions of dollars monthly. The prosecution alleges that a group of employees at the Kuwaiti Health Ministry (located in Washington, D.C.) planned and implemented a scheme to submit false invoices for medical services that were never performed and then deposited the checks issued by the Kuwaiti embassy into banks accounts they controlled.

The leaders of the conspiracy included Hanan Al Sharaf, who was the Financial Attaché at the Health Ministry and who supervised the staff that processed and paid the medical bills. She was assisted by co-conspirator Wael Sedik, who was an accountant at the Health Ministry. Sedik directed members of the conspiracy to create the shell companies and then open bank accounts that corresponded with the company names.

Based upon the discovery provided in this case, it appears that Sedik recruited a woman named Sarah Kassem, whose role in the conspiracy included, among other things, receiving and depositing checks into the shell companies' bank accounts. The Government also brought charges against Walid Ahmed Aly, an accountant at the Kuwaiti Health Ministry, who opened a shell corporation in Virginia called UPMC Global Care, LLC. Finally, the conspiracy also included defendant Huwida Fadl, who worked as a data entry specialist at the Health Ministry. Checks drawn from bank accounts that were associated with the shell companies were deposited into Fadl's bank account.

Ahmed El Khebki did not work at the Kuwait Embassy. He was not familiar with the internal processes at the Health Ministry for approval or medical bills, the billing codes used to request payment, nor was he a sophisticated computer programmer. Rather, he was a "driver," who had a medical transport company named *Pantio Transport*. In that role, Mr. El Khebki drove patients to and from medical appointments. *Pantio* had a contract with the Libyan Embassy and then later the Embassy of Kuwait. There is no question that the defendant actually provided these transport services. As the result of an ongoing civil war in Libya, Mr. El Khebki was owed a significant amount of money and despite working steadily, was experiencing serious financial problems. Co-conspirator Wael Sedik took advantage of this situation; he threatened to withhold all payments from the Embassy of Kuwait to Mr. El Khebki, unless he created business

entities with names that were similar to actual medical service providers. Accordingly, the defendant incorporated a business called *MedStars Health Services* and then opened bank accounts in the name of *Hopiken Medical Services*. These were company names selected by Sedik (and the others) to hide their scheme to defraud.

Moreover, Mr. El Khebki did not create or submit the false invoices, but would sign the fraudulent documents created by Sedik and the others, who would then approve the payments and have a check issued to the shell companies. Attached hereto as Exhibit 2 (to be filed under seal) are some examples of the billing statements submitted for reimbursement and the checks that were issued to *Hopiken* and *Medstars* for medical services that were not rendered. The parties agree that checks totaling approximately $450,536.00 were deposited into the bank accounts opened by the defendant. This is the amount of the loss that is attributable to defendant El Khebki under the federal sentencing guidelines. Mr. El Khebki did not keep all of the funds deposited into his account. Rather, he paid significant amounts to Sedik and the others. Ultimately, this defendant earned (or what he considered reimbursement) approximately $100,000.00 from the conspiracy.

Finally, when the scheme to defraud was uncovered, Sedik and the others attempted to "repay" the money they stole from the Kuwaiti Government by writing re-imbursement checks from UMPC Global Service, a company formed by other members of the conspiracy that had no relation to Mr. El Khebki. Copies of some of those checks to be filed under seal as Exhibit 3.

***The Prosecutions and Sentencings Of Co-Conspirators***

Mr. El Khebki is the last person to be sentenced in this conspiracy. The results of the other conspirators cases should inform the Court's sentencing of this defendant.

The charges against the putative leader of the conspiracy, Hanan Al Sharaf, were dismissed and she was allowed to return to Kuwait without being prosecuted. See 15 MJ 139 at DE 64. The charges against co-conspirator Sarah Kassem were dismissed in federal court, re-filed in Superior Court and then dismissed. See 15 MJ 161 at DE 4. A Superior Court jury acquitted Walid Aly of four of five felony charges in connection with the alleged conspiracy (and returned a hung jury on the remaining counts). [1]

Two members of the conspiracy ultimately pled guilty. Co-conspirator Huwida Fadl – who according to the Government – "coordinated the delivery of false invoices and checks between [a leader of the conspiracy] and the shell company operators . . . in order for them to make arrangements to pick up checks deposit checks or issue new invoices." Notwithstanding her role in the conspiracy, the Government agreed that she was entitled to a "minor role" downward departure, which resulted in a putative guideline sentence of thirty-three months. This Court sentenced her to a year and a day of incarceration.

Finally, Wael Sedik – whose insider knowledge of the protocols used at the Kuwaiti Health Ministry – allowed him to initiate, implement, and manage the conspiracy to defraud in this case, entered into a plea agreement that did not include: (1) two upward adjustment points for sophisticated means; and (2) two other upward points because the because the underlying offense was a violation of 18 U.S. Code Section 1956. The Government nonetheless contends that these four additional points apply to the sentencing in this case.[2] Sedik was ultimately sentenced by this Court to thirty-three months of imprisonment. The defense believes that the

---

[1] Remarkably, after the verdict was returned, the prosecutors waited almost seven months before moving to dismiss the deadlocked count without prejudice, advising the trial judge that they wished to continue and investigation of the defendant concerning "the veracity of statements that he made during his trial testimony." See *United States v. Aly*, 2016 CF2 017973.

[2] Sedik's plea agreement did not include any upward adjustment for his leadership role in the conspiracy.

Government intends to call Wael Sedik as a witness at the contested sentencing hearing in this case.

## LEGAL ANALYSIS

### I.
### SENTENCENTING GUIDELINES

1. **This Court Has The Discretion To Impose A Below Guidelines Sentence**

In undersigned counsel's experience, most sentencing memorandum recite as a matter of course the established legal principles that govern the manner in which the federal sentencing guidelines are to be imposed. It remains critical, however, to point out that the legal paradigm governing the imposition of federal guideline sentences has been dramatically altered and that federal judges are no longer relegated to the status of "automatons," armed with calculator and pencil and the federal sentencing guidelines manual. The change in sentencing law began with the Supreme Court's conclusion more than a decade ago in United States v. Booker, 542 U.S. 220 (2005), that the federal sentencing guidelines were not mandatory, but merely advisory upon the district courts. The change occasioned by *Booker* has grown exponentially; thus while a sentencing court will generally begin its analysis with consideration of the relevant guideline range, it "should" entertain arguments from the parties as to whether a non-guidelines sentence is appropriate. Rita v. United States, 551 U.S. 338, 351 (2007). In making this decision, the trial court will generally consider the sentencing factors set forth in 18 U.S.C. Section 3553(a). Kimbrough v. United States, 552 U.S. 85, 109 (2007). Without doubt the district courts have the discretion to impose a non-guideline sentence based upon their assessment of each individual case. See Gall v. United States, 552 U.S. 38, 47-48 (2007)(abuse of discretion standard applies to review of sentence outside guideline range and there is no mathematical test for reasonableness of sentence).

That analysis thus begins with the calculation of the adjusted sentence guideline calculation.

2. **Plea Agreement Guideline Calculation**

The parties in this case entered into a written Plea Agreement and Statement Of Facts. The Plea Agreement memorializes the difference of opinion between the parties as to the loss amount attributable to Mr. El Khebki. The Government claims that it is the total amount of funds obtained by fraud from the Kuwaiti Health Ministry, which is approximately $1.5 million dollars. The defense believes that the limits of this defendant's liability is the amount deposited into the bank accounts of companies that he created. Moreover, since the entry of the guilty plea in this case, the United States Sentencing Guideline Commission has promulgated a new downward adjustment for defendants such as Mr. El Khebki, who have zero criminal history points. Thus, in the defense view, the defendant's guideline calculation as follows:

| | |
|---|---|
| Base Offense Level USSG 2S1.1. | 7 |
| Loss Amount Over $250,000.00 USSG 2B.1.1 | +12 |
| Violation of 18 USC 1956 USSG 2S1.1(b)(2)(B) | +2 |
| Downward Adjustment Acceptance of Responsibility | -2 |
| Early Entry of Plea | -1 |
| Adjusted Total Offense Level | 18 (27-33 months) |
| Zero Criminal History Reduction USSG 4C1.1 | -2 |
| | 16 (21-27 months) |

### 3. This Court Should Reject The Government's Sentencing Position

As noted, the Government believes that this Court should hold the defendant accountable for the entire amount of loss suffered by the Kuwaiti Government and that an upward adjustment for sophisticated means should apply. This Court should reject both the enhancements under the facts of this case.

#### A. The Loss Amount Attributed To Defendant El Khebki Is The Amount Deposited Into The Bank Accounts He Opened

The parties largely agree as to the amount of funds deposited into the bank accounts opened by the defendant in the names of Medstar Health Services and Hopiken Health Services. That amount was approximately $450,000.00. [3] The Government asks this court to attribute the amount deposited by the co-conspirators into other bank accounts outside of defendant El Khebki's control against him.

Under the federal sentencing guidelines, the conduct of co-conspirators may be considered by the sentencing court only under limited circumstances. In order to hold the defendant accountable for jointly undertaken criminal activity, the district court must make two particularized findings: (1) that the acts were within the scope of the defendant's agreement and (2) that they were foreseeable to the defendant." United States v. Studley, 47 F.3d 569, 574 (2d Cir.1995). See U.S.S.G. § 1B1.3(a)(1)(B). This requires more than mere proof that the defendant had knowledge that the conspiracy was more extensive than his own participation. Thus, in United States v. Khandrius, 613 F. App'x 4, 7 (2d Cir. 2015), the Court of Appeals held that:

> neither "knowledge of another participant's criminal acts," nor "aware[ness] of the scope of the overall operation" alone is enough to deem the defendant responsible for the acts

---

[3] In an email dated November 15, 2022, the Government advised the defense that "a tentative analysis of the checks from the Kuwait Embassy Health Office that were deposited by Mr. El Khebki into the bank accounts of his shell companies. These checks total approximately $450,536.31 in stolen funds.

8

of co-conspirators.

Rather, under the guidelines, responsibility for purposes of sentencing is "not necessarily the same as the scope of the entire conspiracy," sentencing courts must to determine the scope of each defendant's conspiratorial agreement" in order to attribute the actions of co-conspirators for purposes of the loss amount. United States v. Mellen, 393 F.3d 175, 183 (D.C.Cir.2004).

In order to prevail on its theory of loss, the Government bears the burden of proving in the first instance that the scope of defendant El Khebki's conspiracy included knowledge that other funds were obtained by fraud by the co-conspirators and were deposited into bank accounts outside of his control and for which he did not profit. Moreover, the prosecution must prove that the scope of Mr. El Khebki's conspiracy included the theft of the other funds, that is to say, that it was something he wished to bring about. Under the circumstances of this case, the suggestion that the scope of this defendant's conspiracy included the entire loss amount is contrary to both the law, the facts, and common sense. Mr. El Khebki did not work at the Kuwaiti Embassy, did not personally know most of the other members of the conspiracy, did not participate in opening other bank accounts, and did not profit from that conduct. Thus, the loss amounts attributable to him is limited to the funds deposited into the *Hopiken* and *Medstar* accounts.

### B. *The Conspiracy Did Not Involve Sophisticated Means*

The Government also seeks to impose a ia two-level upward adjustment for "sophisticated means" against the defendant. Remarkably, this upward adjustment does not appear in the plea agreements for co-conspirators Wael Sedik or Huwida Fadl. It is hard to find any principled reason why the adjustment would apply against Mr. El Khebki, when it did not increase the sentencing guideline of more culpable members of the conspiracy.

The Federal Sentencing Guidelines address the factors relevant for proving such sophisticated means. They note that:

> For purposes of subsection (b)(10)(C), "*sophisticated means*" means **especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.** For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means (emphasis added).

The intricate and complex part of the conspiracy in this case was the manipulation of invoices and their approval by the Kuwaiti Health Ministry. Mr. El Khebki played no part in that process. To be sure, this case involved the use of fictitious entities, but that was a matter decided by the leaders of the conspiracy, not this defendant. Moreover, Mr. El Khebki took no other steps to hide his creation of these accounts. They were registered in his name and at his home address. For these reasons, the defense does not believe that the enhancement for "sophisticated means" applies in this case.

### C. The Parties Did Not Agree To An Obstruction Of Justice Enhancement And It Does Not Apply To This Case

The Probation Office included in its guideline calculation a two point upward adjustment for Obstruction of Justice because the defendant left the United States while the investigation against him was pending and did not return when requested by law enforcement. See PSR at para. 57. This sentencing enhancement was not agreed to by the parties in the plea agreement.

Moreover, by the express terms of the relevant guideline provision, it does not result in the imposition of a two-level upward adjustment in this case. The PSR specifically refers to USSG Section 3C1.1, note 5 as the basis for the obstruction enhancement. That commentary, however, specifically notes that:

**Some types of conduct ordinarily do not warrant application of this adjustment** but may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments apply

The following is a non-exhaustive list of examples of the types of conduct to which this application note applies

. . . . . . .

(D) avoiding or fleeing from arrest (emphasis added).

Thus, in <u>United States v. Alpert</u>, 28 F.3d 1104 (11th Cir. 1994), the Court of Appeals held that the district court incorrectly imposed a two-level upward adjustment when the defendants fled the Northern District of Georgia in the midst of plea negotiations with the Government and moved to California. The Court of Appeals reviewed the specific sentencing guideline provision relied upon by the Probation Office in this case and held that

> The § 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest, without more. Such persons do not face a two-level enhancement for failing to remain within the jurisdiction or for failing to keep the Government apprised of their whereabouts during its pre-indictment investigation.

<u>Alpert</u>, 28 F.3d at 1107.

In this case, the defendant left the United States before he was criminally charged. He was thereafter unable to return to this country from Sudan because of the worldwide pandemic and the loss of his passport. Under the controlling guideline provision, this conduct does not result in a two-level upward adjustment as a matter of law.

## II.
## SENTENCING GUIDELINE FACTORS

Once the adjusted guideline offense level has been calculated, the Court then turns to a consideration of the following statutory sentencing factors: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentencing to

11

reflect the seriousness of the offense, to promote respect for law, and to provide just punishment; (3) specific and general deterrence; (4) the need to provide the defendant with training, medical care, or treatment; available sentencing alternatives; (5) consistency in sentencing among similarly-situated defendants; and (6) the need to provide restitution. See 18 U.S.C. § 3553(a).

The following sections address those considerations.

### 1. *Defendant's Personal Characteristics*

The rules of conduct that govern the American justice system do not permit the sentencing judge in a criminal case to really "get to know" a defendant. There is no opportunity for conversation or a personal exchange between sentencing judge and defendant. In this case, the only time the Court has actually seen the defendant is person was during the change of plea hearing; the remaining few court appearances were conducted virtually because of the pandemic. But Ahmed El Khebki is not merely a criminal defendant; he is a husband and father, a worker, a dreamer, a thinker – and he is more than the sum of the charges against him. The following is a summary of the defendant's personal history.

Ahmed El Khebki is a sixty-four year-old American citizen, who was born was in Cairo, Egypt. The defendant's father died when he in his late teens and as the eldest, the responsibility fell to him to support his younger siblings. He first moved to Saudi Arabia and then later the United States, where he became a citizen. The defendant has been married to his wife Salwa for more than thirty years and is the father of four children. The defendant's mother still lives in Cairo, Egypt and the defendant is her principal source of financial support.

For most of his life in the United States, the defendant was self-employed as a driver and owned a company called Pantio Transport, which (as the name implies) transported patients to and from medical procedures. The defendant worked for the Libyan Embassy for many years,

but as the result of political uncertainty during the civil war, the defendant was not paid for many of the transportation services he provided. The defendant also began working as a driver for the Embassy of Kuwait, and his worsening financial situation left him in a vulnerable position with respect to the conspiracy engineered by the employees at the health ministry.

It has been clear throughout the proceedings in this case that the Government would like to paint the defendant as a criminally minded person. That suggestion is heartily rebutted by the letters in support of the defendant submitted by his family and friends. His son Gunim Elkhebri wrote in a letter to this Court that his father "was the reason why he went to George Mason University and obtained my Bachelor of Science in Computer Programming" and that his father "is a God-fearing man and . . he is no threat to society."

Similarly, the defendant's sister wrote that Mr. El Khebki was "a father figure" to her after their father passed away when she was only thirteen years old. She wrote that the defendant provided "financially for me, my siblings, and our mother. He has always been a man I looked up to in life." This sentiment was echoed by the defendant's youngest brother Osama Elkhabry, who wrote to this Court that:

> Ahmed eventually moved to Saudi Arabia where he continued to work and would send us money each month. While Ahmed was in Saudi Arabia, our middle brother, regrettably, took his own life. His loss devastated all of us and permanently scarred our family. Ahmed, however, did not waiver in his support an carried our family while grieving. After working for 10 years in Saudi Arabia, he moved to American where he continued to work and support my mom, sister, and adopted sister in Egypt, while also assisting me in the United States and simultaneously beginning a family of his own.

Among the remaining letters of support for the defendant, one stands out. Mohamed Ibrahim, the best friend of one of the defendant's sons, wrote a heartfelt testimonial to the defendant's remarkable character. Mohammed explained that the defendant was not just a neighbor, but was a "second father" to him. He recalled that the defendant would

13

take us to football practice and games, instilling in us a sense of discipline and camaraderie that extended beyond the playing field. His dedication went beyond the call of duty; he wasn't just there for the victories but also for the defeats teaching us resilience and sportsmanship. And who could forget the post-game rituals, where he'd treat us to McDonalds, turning ordinary moments into cherished memories.

These letters are a testament to the defendant's fierce loyalty and devotion to family and should be given significant weight by this Court when fashioning an appropriate sentence.

*Age/Health Problems*

Ahmed El Khebki is now sixty-four years old and suffers from a variety of what can only be described as serious medical problems. The Presentence Report acknowledges that the defendant suffers from:

> high blood pressure (diagnosis in1995); high cholesterol (diagnosis in 2019); enlarged prostate (diagnosis in 2019); arthritis (diagnosis in 2018); enlarged heart/heart failure (diagnosis in 2018); and pre-diabetes(diagnosis in 2022). Further, the defendant indicated having a hernia operation in 2014,and had to remove fluid from his right knee in 2016. According to the defendant, he needs a knee replacement on his right knee. He is prescribed the following medications: tamsulosin; Losartan Potassium HCT; Asprin; Omeprazol; Simustatin; Hydrochlorothiazide; Atenolol; and Amlodipine. As previously mentioned, there is a family history of high blood pressure and prostate cancer.

PSR at para.92. Since the PSR was prepared, the defendant underwent a full knee replacement on November 10, 2023. Although he is recuperating, he remains in pain and needs a cane to provide stability while walking. The defendant is also obese. A copy of some of his medical records are being filed under seal as Exhibit 4.

The defendant's age and medical problems are a factor that this Court can rely upon to impose a below guideline sentence. Indeed, several courts have relied upon age as a factor to warrant a downward sentence variance. In United States v. Carmona–Rodriguez, 2005 WL 840464 (S.D.N.Y.), for example, the defendant pled guilty to conspiracy to possess heroin and her adjusted guideline sentence was 46 to 57 months. The district court noted that other recent district court decisions had imposed below guideline sentences for defendants "who were over

14

the age of forty on the grounds that such defendants exhibit markedly lower rates of recidivism." Carmona-Rodriguez, at p. 3. Based upon her age and health problems with high blood pressure and diabetes, the district court imposed a sentence of only thirty months. Similarly, in United States v. Gray, 453 F.3d 1323 (11thCir. 2006), the Court of Appeals affirmed a sentence of seventy-two months of incarceration when the defendant's guideline range was 151-188 months. Even though this defendant had possessed as many as three hundred pornographic images of children, the district court gave a downward variance of more than fifty percent because of his "age, his prior minimal criminal record, and his medical condition." 453 F.3d at 1325.

2. *Seriousness of the Offense/Promote Respect for the Law/Just Punishment*

There is no doubt that the crime for which defendant El Khebki admitted his guilt is a serious matter. The defendant knows that he violated the law and has done all that is within his power to acknowledge responsibility for his actions. He entered a timely guilty plea in the case and has obviated the need for a trial of the charges against him.

The task of fashioning a sentence to promote respect for the law and to reflect the seriousness of the offense is in some respects an existential quest. But as at least one district court judge has noted "it is not always necessary to incarcerate a defendant to promote such respect and demonstrate the seriousness of the crime." United States v. Smith, 2009 WL 24917 (N.D. Ohio). What promotes respect for the law is a fair sentence and under the totality of the circumstances in this case, the defense believes that the requested sentence of no more than one year and one day is fair for this particular defendant under the particular facts of his case.

3. *Specific and General Deterrence/Prevent Future Crimes*

The factor of specific deterrence also supports a below guidelines sentence in this case. The defendant has written this court a letter that is being translated for submission to the Court,

15

but in the letter, he will admit his involvement in the case ("I pled guilty because I am guilty"); expresses sincere remorse for his actions, particularly as they impact his family. The defendant has told undersigned that he never again intends to be involved in such business. There is every reason to believe him. Given the distinct circumstances of this case, there is no reasonable probability that the defendant will commit any such similar crime in the future.

The interests of specific deterrence would be satisfied by a sentence of no more than one year and a day, plus a three-year period of supervised release. In this way, the Court would retain jurisdiction over the defendant – with the very clear understanding that any violation of his conditions of supervised release would send him immediately back to jail. No additional punishment for Ahmed El Khebki is needed. [4]

### 4. *Avoiding Unwarranted Sentencing Disparity*

As a final matter, this Court is obligated to avoid unwarranted sentencing disparity among similarly situated defendants. As noted, the charges against the putative leader of the conspiracy, Hanan Al Sharaf, were dismissed and she faced no further prosecution in this country (or in Kuwait upon her return). The charges against co-conspirator Sarah Kassem were also dismissed. A Superior Court jury acquitted Walid Aly of participation in the charged conspiracy. The Government recommended a thirty-three month period of incarceration for Huwida Fadl, but this court imposed a sentence of one year and one day. Finally, Wael Sedik, who by any objective standard was a leader of the conspiracy, was sentenced to thirty-three months.

---

[4] The defense request that no fine be imposed because the defendant has no available assets to use for such payment. See PSR paragraph 110.

Given defendant El Khebki's significantly more limited role in this case and the totality of circumstances present, this Court should impose no more than a sentence equal to that imposed upon Fadl – one year and one day – in order to avoid unwarranted sentencing disparity.

## CONCLUSION

The sentencing of any person is a complex task for the Court. Through the submission of this memorandum, the defense has tried to provide context to assist the Court in imposing a sentence that satisfies the requirements of the law and American notions of justice. For all the reasons set forth in this memorandum, the defense asks this Court to grant a downward variance and sentence defendant Ahmed El Khebki to a term of imprisonment of no more than one year and one day, with credit for the time he spent incarcerated after his arrest and before pretrial release was granted. Finally, given the defendant's age and health problems, the defense respectfully requests that this Court recommend designation at the Bureau of Prisons Federal Medical Center located in Devens, Massachusetts.

Respectfully submitted,

*Robert Feitel*

_____
Robert Feitel, Esquire
1300 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
D.C. Bar No. 366673
202-255-6637 (cellular)
RF@RFeitelLaw.com

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing was sent via ECF, to, MLARS Trial Attorneys Shai Bronthtein and Jonathan Baum, United States Department of Justice, 1400 New York Avenue, N.W.. Washington, D.C. this 26th day of November, 2023.

*Robert Feitel*

_____
Robert Feitel